UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

EMETERIA MUÑOZ, individually and as Administratrix
of the Estate of JAIRO POLANCO MUÑOZ

                                Plaintiff,

                  -against-

THE CITY OF NEW YORK; NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION ("NYCHHC");
Former NYCHHC President DR. RAM RAJU; New York
City Department of Correction ("DOC") Commissioner
JOSEPH PONTE; DOCTOR EUGENIO MATEO;
DOCTOR ROMMEL MONTILUS; CHARLES APPIAH;
MICHAEL BOLUS; DOC Officer Kenneth Keels; DOC
Officers and Supervisors DOES ONE THROUGH TEN;
DOC or NYCHHC Supervisory and Staff Medical Providers
ROES ONE THROUGH TEN,

                                Defendants.
---------------------------------------------------------------------- x

**FIRST AMENDED
COMPLAINT AND
JURY DEMAND**

      Plaintiff Emeteria Muñoz makes the following allegations against Defendants, by and

through her undersigned counsel.

### I. PRELIMINARY STATEMENT

      1.      This is a civil rights action brought by Plaintiff Emeteria Muñoz,

individually and as Administratrix of the estate of her son, Jairo Polanco Muñoz, a homeless man

who, due to shocking indifference on the part of the City and other Defendants, died three days

after being incarcerated in the New York City jails in March 2016.

      2.      Mr. Muñoz was only twenty-four years old at the time of his death, but by

then he already had a long history of serious psychiatric treatment needs. That history was

known to Defendants. Mr. Muñoz was diagnosed with schizophrenia, bipolar disorder, and

depression, and indeed, had made a serious suicide attempt while in New York City Department

of Correction ("DOC") custody less than one year prior to his death.  Because of Defendants'
failure to adequately screen Mr. Muñoz, appropriately assess his suicide risk, place him in
appropriate housing, and provide him with critically needed psychiatric treatment, he was left
alone to hang himself in his cell.

3.      Mr. Muñoz's prior suicide attempt in DOC custody occurred on April 17,
2015 under circumstances similar to those that led to his tragic death in March 2016 and give rise
to this action. At that time, Mr. Muñoz attempted suicide by hanging while left alone in an intake
cell just four days after his arrival into DOC custody. As a result, Mr. Muñoz was hospitalized
for almost one week before he was returned to jail on April 23, 2015. Two days later, he again
threatened suicide and was referred to the hospital. Mr. Muñoz was ultimately placed in a jail
housing area specifically intended for persons with serious psychiatric treatment needs. He was
released from custody in July 2015.

4.      In early 2016, Mr. Muñoz was hospitalized for psychiatric treatment. On
March 11, 2016, mere days after his discharge from the hospital, Mr. Muñoz was arrested for
petit larceny in connection with the theft of a cellphone at a Dunkin Donuts. Mr. Muñoz's bail
was set at $750, but without a home or access to resources, he was unable to pay this bail and
was again incarcerated by DOC.

5.      In March 2016, when Mr. Muñoz was taken into DOC custody, the court
noted in the commitment papers that he required medical attention. Mr. Muñoz's New York City
Health and Hospitals Corporation ("NYCHHC") and DOC records documented his serious
psychiatric treatment needs and his suicide attempt upon admission to DOC custody the previous
year. Those records provided Defendants with actual knowledge of his suicide risk in the jail

setting and documented his history of psychiatric treatment in DOC custody, rapid psychiatric

deterioration, repeated suicidal ideation, and need for specialized mental health housing.

6.      Despite this evidence of Mr. Muñoz's suicide risk in a jail setting,

Defendants placed Mr. Muñoz in a general population cell rather than an area with necessary

treatment available. After placing Mr. Muñoz in an inappropriate setting, Defendants' increased

his suicide risk by cancelling his psychiatric assessment due to a jail lockdown.  Defendants

cancelled Mr. Muñoz's psychiatric assessment despite their public assertion, less than a week

prior, that medical appointments are never cancelled due to jail lockdowns. Defendants did not

attempt to transport Mr. Muñoz to the medical clinic, remove him from his cell, or monitor his

suicidality during the lockdown.

7.      On information and belief, Mr. Muñoz hanged himself during that

lockdown. When Defendants finally found Mr. Muñoz, he was sitting on the toilet in his cell. He

was cold to the touch. His body was already stiff. His mouth could not be opened for intubation.

Cyanosis and rigor mortis had set in. Defendants had left him in his cell—dead—for at least two

hours.

8.      Defendant City and its officials are and have been aware that the period

immediately following arrest and incarceration is often a period of greater suicide risk, especially

for people entering the jails with serious psychiatric treatment needs and/or histories of

suicidality. To mitigate that risk, Defendant City's written policy states that individuals who

have attempted suicide less than one year prior to their incarceration must be placed in mental

observation housing on constant supervision, and must receive a prompt psychiatric assessment.

Despite that written policy, and despite Mr. Muñoz's suicide attempt while in DOC custody less

than one year prior to his arrest, the City and other Defendants failed to take any precautions to ensure Mr. Muñoz's safety.

9.     The fatally deficient psychiatric treatment provided to Mr. Muñoz is pursuant to Defendants' custom or practice of deliberate indifference to the serious medical needs of individuals entering the jails with serious psychiatric treatment needs and/or a heightened risk of suicide. That deliberate indifference manifests in Defendant City's failure to adequately screen those individuals, appropriately assess their suicide risk, place them in appropriate settings, assess their psychiatric treatment needs, and provide them with psychiatric treatment when they are isolated due to lockdowns or other adverse jail conditions. Defendant City's custom or practice of deliberate indifference caused Mr. Muñoz's death.

10.    Defendants' actions were contrary to law and sound correctional and medical practice. Plaintiff seeks monetary damages against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## II. JURISDICTION AND VENUE

11.    This action is brought pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, the New York State Constitution and common law.

12.    The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a), and 2201, and the doctrine of pendent jurisdiction.

13.    Venue is laid within the United States District Court for the Southern District of New York in that Defendants are located within, and a substantial part of the events giving rise to the claim occurred within, the boundaries of the Southern District of New York. Venue is lodged in this court pursuant to 28 U.S.C. §1391(b).

### III. PARTIES

14.     JAIRO POLANCO MUÑOZ was a detainee of the City of New York when he died while in the custody of DOC, at Manhattan Detention Complex ("MDC"). All of the events giving rise to this Complaint, including the death of Mr. Muñoz on March 14, 2016, occurred in New York, New York. At the time of his death, Mr. Muñoz was a citizen of the United States and resided in New York, New York. He was 24 years old.

15.     Plaintiff EMETERIA MUÑOZ is the mother of decedent JAIRO POLANCO MUÑOZ, who died without issue. Ms. Muñoz is a citizen of the United States and resides in New York, New York.

16.     Prior to the commencement of this action, on May 26, 2017, Plaintiff was granted LETTERS OF LIMITED ADMINISTRATION for the estate of decedent Mr. Muñoz, by order of the Honorable Margarita Lopez Torres, Kings County Surrogate. In bringing this action against the above named Defendants, Plaintiff acts in her individual capacity as the mother of Mr. Muñoz and in her representative capacity on behalf of the estate of Mr. Muñoz.

17.     Defendant the City of New York (the "City") is a municipal corporation organized under the laws of the State of New York. Defendant City, through DOC, operates a number of jails and is ultimately responsible for the care and safety of individuals detained in those jails.

18.     Defendant NYCHHC is a corporation organized under the laws of the State of New York. Defendant NYCHHC provides medical and psychiatric treatment in those jails pursuant to a contract with Defendant City, and is ultimately responsible for the medical and psychiatric treatment of individuals detained in those jails. NYCHHC assumed responsibility for the provision of medical and psychiatric treatment in Defendant City's jails in 2015. Prior to that,

5

Defendant City provided such services through its Department of Health and Mental Hygiene which in turn contracted with various entities.

19.     Defendant Joseph Ponte was at the time of the events at issue here and is currently the Commissioner of DOC. In his capacity as Commissioner of DOC, Defendant Ponte acts in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and under color of state law. Upon information and belief, Defendant Ponte, as Commissioner of DOC, was and is responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and for the training, supervision, and conduct of all DOC personnel, including Defendants referenced herein. As Commissioner, Defendant Ponte was and is also responsible for the care, custody, and control of all individuals placed in DOC's jails, and for enforcing DOC rules and ensuring that DOC personnel obey the laws of the United States and of the State of New York. Defendant Ponte is sued in his individual capacity.

20.     Defendant Dr. Ram Raju was at the time of the events at issue here the President of NYCHHC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and under color of state law. Upon information and belief, Defendant Dr. Raju, as President of NYCHHC, was responsible for the policy, practice, supervision, implementation, and conduct of all NYCHHC matters and for the training, supervision, and conduct of all NYCHHC personnel, including the Defendants referenced herein. As President, Defendant Dr. Raju was also responsible for the medical and psychiatric care of all individuals placed in DOC's jails, and for enforcing the rules of NYCHHC and ensuring that NYCHHC staff obeyed the laws of the United States and the State of New York. Defendant Dr. Raju is sued in his individual capacity.

21.     Defendant Ponte and Defendant Dr. Raju are herein collectively referred to as "Supervisory Defendants."

22.     On information and belief, at all times relevant hereto, Dr. Eugenio Mateo was a physician employed by NYCHHC and assigned to MDC. Dr. Mateo was responsible for the provision of appropriate medical and psychiatric treatment to patients at MDC, including Mr. Muñoz.

23.     On information and belief, at all times relevant hereto, Defendant Dr. Rommel Montilus was a physician employed by NYCHHC and assigned to MDC. Defendant Dr. Montilus was responsible for the provision of appropriate medical and psychiatric treatment to patients at MDC, including Mr. Muñoz.

24.     On information and belief, at all times relevant hereto, Defendant Charles Appiah was a Registered Physician's Assistant ("RPA") employed by NYCHHC and assigned to MDC. Defendant RPA Appiah was responsible for the provision of appropriate medical and psychiatric treatment to patients at MDC, including Mr. Muñoz.

25.     On information and belief, at all times relevant hereto, Defendant Michael Bolus was a Nurse Practitioner ("NP") employed by NYCHHC and assigned to MDC. Defendant NP Bolus was responsible for the provision of appropriate medical and psychiatric care to patients at MDC, including Mr. Muñoz.

26.     On information and belief, at all times relevant hereto, Defendant Kenneth Keels was a DOC Officer and was responsible for filling out Form 330 as part of Mr. Muñoz's DOC intake on March 12, 2016.

27.     Defendants Doe one through ten, sued in their individual and official capacities, are unidentified DOC correctional officers or supervisors who were responsible for

Mr. Muñoz while he was in DOC custody from March 11, 2016 until his death on March 14, 2016. Defendants Doe one through ten are sued under fictitious designations because Plaintiff has been unable to ascertain their names and, where relevant, badge numbers, notwithstanding reasonable efforts to do so.

28.     Defendants Doe and Defendant Keels are herein collectively referred to as "Individual Officer Defendants."

29.     Defendants Roe one through ten, sued in their individual and official capacities, are unidentified DOC/NYCHHC medical providers or supervisors who were responsible for the provision of appropriate medical and psychiatric treatment to Mr. Muñoz while Mr. Muñoz was in DOC custody from March 11, 2016 until his death on March 14, 2016. Defendants Roe one through ten are sued under fictitious designations because Plaintiff has been unable to ascertain their names, notwithstanding reasonable efforts to do so.

30.     Defendants Dr. Eugenio Mateo, Dr. Rommel Montilus, Charles Appiah, Michael Bolus, and Defendants Roe are herein collectively referred to as "Medical Defendants."

31.     At all times, Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## IV. NOTICE OF CLAIM

32.     On April 21, 2016 and within 90 days of the date of the March 14, 2016 death of her son, Plaintiff Emeteria Muñoz filed a written notice of claim with the City of New York as a condition precedent to the initiation of this civil action. The notice of claim named as defendants the City of New York, New York City Health and Hospitals Corporation, New York

City Correctional Health Services, New York City Department of Correction, and Individual

Correction Officers and Employees of Correctional Health Services – John Does 1-25.

33.     That written notice of claim, sworn to by Plaintiff, was served upon

Defendants by personal delivery of the notice to the Comptroller's office at 1 Centre Street, New

York, New York. That written notice of claim, sworn to by Plaintiff, was served upon Defendant

NYCHHC by personal delivery of the notice on June 12, 2017.

34.     Not having resolved her claims against Defendant City within thirty days

of the filing of this notice, Plaintiff exercises her right under New York State's General

Municipal Law § 50-h to institute the instant action.

35.     At least thirty days have elapsed since the service of the notice of claim on

Defendant City, and adjustment or payment of the claim has been neglected or refused.

## V. JOINT LIABILITY

36.     This action falls within one or more of the exceptions set forth in CPLR

§ 1602.

## VI.  JURY DEMAND

37.     Plaintiff demands trial by jury in this action.

## VII. FACTUAL ALLEGATIONS

## MR. MUÑOZ'S HISTORY OF SERIOUS PSYCHIATRIC TREATMENT NEEDS.

38.     Mr. Muñoz was diagnosed with schizophrenia, bipolar disorder, and

depression. He was first hospitalized for psychiatric treatment when he was eight years old, and

lived in and received psychiatric treatment at various group homes throughout his childhood.

39.     Mr. Muñoz was hospitalized for psychiatric treatment on at least nine occasions prior to his hospitalization for his attempted suicide on April 17, 2015 while in DOC custody.

40.     Prior to Mr. Muñoz's subsequent and fatal March 2016 incarceration, he had been incarcerated by Defendant City and placed in DOC custody on multiple occasions. As part of those incarcerations, Mr. Muñoz reported to Defendants his history of serious psychiatric treatment needs and suicidality, and his history of multiple medications prescribed to treat his mental illnesses, including Clorazil, Haldol, Risperdal, Seroquel, Zyprexa, Abilify, Depakote, and Latuda.

**DEFENDANTS' FIRST FAILURE TO ADDRESS MR. MUÑOZ'S SERIOUS PSYCHIATRIC NEEDS AND HIS RESULTING SUICIDE ATTEMPT IN JAIL.**

41.     On or about April 13, 2015, Mr. Muñoz was admitted to DOC custody and incarcerated at the Vernon C. Bain Center ("VCBC"), a DOC facility, in general population. VCBC is an 800-bed jail on a barge docked in the Bronx.  It does not have any specialized mental health units or suicide watch beds or cells.

42.     During Mr. Muñoz's first five days in DOC custody on that incarceration, DOC and NYCHHC completed several intake forms and evaluations pursuant to Defendant City's written policies. Those forms and evaluations were designed to assess Mr. Muñoz's psychiatric needs and suicide risk, and ensure his access to needed psychiatric treatment. DOC and NYCHHC made several errors in filling out those forms. In fact, many answers to the forms' prompts directly contradicted each other, utterly failing to achieve their purpose of guiding decision-making for individuals with suicide risks.

43.     On or about April 13, 2015, DOC completed a Form 330 "Suicide Prevention Screening Guidelines" checklist ("Form 330") for Mr. Muñoz pursuant to Defendant

City's written policy. Question 7 of Form 330 asks whether the detainee has a history of counseling or mental health evaluation/treatment, and requires that the screening officer note the detainee's current psychotropic medications and name the detainee's most recent treatment agency. The DOC screening officer who completed Mr. Muñoz's Form 330 did not indicate a "yes" check for Question 7, or any other question on the form, even though Mr. Muñoz had a well-documented history of counseling and mental health evaluation/treatment, and had been prescribed psychotropic medications in the past. The space designated for the badge number and signature of the screening officer was left blank.

44.     On or about April 14, 2015, NYCHHC personnel completed a "Mental Health Intake History" for Mr. Muñoz pursuant to Defendant City's written policy. NYCHHC personnel indicated on the "Mental Health Intake History" that Mr. Muñoz was diagnosed with schizophrenia, was last hospitalized for mental health treatment in January of 2014, and had a family history of mental illness. In that respect, NYCHHC's "Mental Health Intake History" directly contradicted DOC's Form 330. NYCHHC's "Mental Health Intake History," however, also provided Defendant City and NYCHHC with actual notice of Mr. Munoz's serious psychiatric treatment needs and risk of suicide.

45.     On or about April 14, 2015, NYCHHC performed on Mr. Muñoz a standard medical examination pursuant to Defendant City's written policy. As a result of that evaluation, NYCHHC referred Mr. Muñoz for a psychiatric assessment. On April 15, 2015, NYCHHC performed that psychiatric assessment. Despite Mr. Muñoz's known history of serious psychiatric treatment needs and risk of suicide, Defendant City and NYCHHC sent Mr. Muñoz to general population housing rather than mental health housing. Mr. Muñoz then languished in general population for almost three days without any psychiatric treatment.

46.     On or about April 17, 2015 at approximately 9:18 pm, DOC employees

referred Mr. Muñoz to Mental Health "due to experiencing bizarre behaviors . . . NYCHHC

Clinician observed patient from waiting area and patient appeared extremely paranoid, agitated,

and crying." Mental Health clinicians employed by NYCHHC recommended that Mr. Muñoz be

sent to Bellevue Psychiatric Hospital ("Bellevue") for further assessment. When a detainee must

be transferred outside a facility for psychiatric reasons, DOC places that detainee in an intake

pen while awaiting a DOC transfer van. During that time, DOC staff must implement constant

supervision of that detainee.

47.     On or about April 17, 2015, at approximately 10:50pm, while in DOC

custody and awaiting transfer to Bellevue, Mr. Muñoz attempted suicide in an intake cell by

hanging himself using a t-shirt. Defendant NYCHHC's records indicate that Mr. Muñoz was

found "on the floor of the intake cell breathing heavy after trying to hang himself." EMS was

called and Mr. Muñoz was transported to Lincoln Hospital and subsequently transferred to

Bellevue. He was treated in a hospital setting from approximately April 17, 2015 until April 23,

2015. Mr. Muñoz's April 17, 2015 attempted suicide was so serious that it resulted in a coma and

required him to have a breathing tube inserted. Mr. Muñoz's attempted suicide in an intake cell

demonstrates a failure of DOC's constant supervision policy.

48.     On or about April 23, 2015, Mr. Muñoz was returned to VCBC from

Bellevue and again placed in general population, despite Defendant City and NYCHHC's actual

knowledge of his serious psychiatric treatment needs and risk of suicide.  Two days later, he was

again referred to the hospital after threatening suicide.  Defendant NYCHHC indicated in its

notes, included in Mr. Muñoz's DOC file, that "The patient has a long psych hx including

unsuccessful hang up in prison last week. He is again suicidal, injured two correction officers

and is a clear damger [sic] to himself and others."

49.     Mr. Muñoz was returned to DOC custody later that day and was

eventually placed in mental health housing on Rikers Island, where he remained until his release

on or around July 2015.

## DEFENDANTS' SECOND FAILURE TO ADDRESS MR. MUÑOZ'S SERIOUS PSYCHIATRIC NEEDS AND SUICIDALITY.

50.     On or about February 23, 2016, Mr. Muñoz was arrested and held on bail

under DOC custody. Once again, during intake, Defendants demonstrated their deliberate

indifference to his needs, and to providing proper treatment to individuals entering the jails who

have psychiatric treatment needs and a history of suicidality, including a failure to properly

screen those individuals.

51.     On or about February 25, 2016, DOC completed a Form 330 for Mr.

Muñoz pursuant to its intake policy. This time, DOC answered "Yes" in response to Question 7,

which asks about prior mental health history. DOC also answered "Yes" in response to question

10a, indicating that Mr. Muñoz had a previous suicide attempt, but erroneously answered that the

attempt occurred in December 2014 rather than April 2015. DOC made that error despite its

actual knowledge of Mr. Muñoz's April 17, 2015 suicide attempt, which was made in DOC

custody.

52.     DOC's intake policy requires the agency to immediately initiate constant

supervision and transfer a detainee to mental observation housing where that detainee has

attempted suicide within the previous year. DOC took neither of those steps in Mr. Muñoz's case

because of its failure to properly fill out Form 330.

53.     DOC's failure to adequately screen for Mr. Muñoz's serious psychiatric treatment needs during his February 2016 incarceration did not end there. DOC also indicated on Form 330 that Mr. Muñoz did not have a history of drug or alcohol abuse and did not show signs of depression. In fact, Mr. Muñoz's history of drug and alcohol abuse was well-documented in his "Intake Social History" form. His "Mental Health Intake History" form clearly stated that he was feeling "hopeless or worthless" and was experiencing "little pleasure in doing things."

54.     Although NYCHHC eventually referred Mr. Muñoz for a mental health evaluation, he was not seen for that evaluation due to a lockdown. On or about February 25, 2016, NYCHHC completed a "Mental Health Intake Appointment" note which indicated that Mr. Muñoz had not been seen for his initial assessment due to a "DOC Event[.] As per DOC, no escort. PT not produced. To be rescheduled."

55.     That cancellation was due solely to Defendant City's custom or practice of deliberate indifference in failing to provide proper treatment to individuals entering the jails who have serious psychiatric treatment needs and/or are at risk of suicide, including its persistent cancelling of mental health appointments during lockdowns.

56.     Mr. Muñoz was released from that period of incarceration on or about February 29, 2016.

57.     DOC records show that almost immediately after his released, he was hospitalized for inpatient mental health treatment at Staten Island University Hospital in March of 2016.

## DEFENDANTS' THIRD AND FATAL FAILURE TO ADDRESS MR. MUÑOZ'S SERIOUS PSYCHIATRIC NEEDS AND SUICIDALITY.

58.     On or around March 11, 2016, Mr. Muñoz was admitted to DOC custody on a misdemeanor charge of petit larceny for allegedly stealing a cellphone at a Dunkin Donuts.

14

Judge Guy Mitchell of the New York Supreme Court set bail at $750. Because he was poor and homeless, Mr. Muñoz could not pay that bail, and so was sent to DOC custody and held at MDC.

59.     Contained within the securing order issued by Judge Mitchell at Mr. Muñoz's arraignment, in the remarks section, was a note that Mr. Muñoz should receive medical attention.

60.     At the time of his March 2016 incarceration, Mr. Muñoz was 24 years old and carried diagnoses of schizophrenia, bipolar disorder, and depression. Mr. Muñoz was in obvious need of psychiatric treatment, and Defendants had actual knowledge of his prior suicide attempt, including his April 2015 attempt, which occurred in DOC custody. However, from the moment he arrived in DOC custody, his serious psychiatric treatment needs and risk of suicide were ignored. Defendants failed to adequately screen Mr. Muñoz, appropriately assess his suicide risk, place him in an appropriate setting, assess his psychiatric treatment needs, and provide him with psychiatric treatment during a jail lockdown. Those failures, which are pursuant to Defendant City's custom or practice of deliberate indifference by failing to provide proper treatment and housing to individuals entering the jails who have serious psychiatric treatment needs and/or are at risk of suicide, caused Mr. Muñoz's death.

Defendants' initial failure to screen and address Mr. Muñoz's serious psychiatric needs and suicidality.

61.     On or about March 12, 2016, at approximately 12:15 am, as part of the intake process, Defendant Keels completed the Form 330 for Mr. Muñoz. Defendant Keels indicated "Yes" in response to Question 7 about treatment history and Question 10a about prior suicide attempts, demonstrating that Defendants had actual knowledge of Mr. Muñoz's history of counseling, mental health evaluation/treatment, and his suicide attempt.

62.   Defendant Keels did not include any additional information in response to Question 10a, and did not include detail about Mr. Muñoz's previous suicide attempt on or about April 17, 2015, while in DOC custody. Defendant Keels omitted information about that suicide attempt even though it was known to DOC and NYCHHC.

63.   Defendant Keels responded "No" in response to Question 10b, indicating that Mr. Muñoz's previous suicide attempt had not occurred within the last year. Defendant Keels responded to question 10b erroneously. It was known to both DOC and NYCHHC that Mr. Muñoz's suicide had occurred in April 2015, less than one year prior to his March 2016 incarceration.

64.   DOC Directive 4521 requires immediate measures on the part of DOC in the event that a newly detained individual has attempted suicide within the last year. That Directive requires the DOC to immediately initiate constant supervision, immediately refer the detainee to mental health, immediately remove all items that may be issued to cause self-harm (including belts, shoelaces, drawstrings, and neckties), and transfer that detainee to mental observation housing. Once placed on constant supervision in mental health housing, staff must maintain a continuous, direct, and clear view of that detainee, and the ability to immediately and directly intervene in response to situations or behavior observed that threaten the health and safety of detainees or the good order of the facility. Constant supervision and suicide watch measures are designed specifically to ensure the health, safety, and welfare of diagnosed and potentially suicidal detainees in the custody of DOC.

65.   NYCHHC Policy MH-15 requires immediate measures on the part of NYCHHC in the event that a new detainee has attempted suicide within the last year. That policy requires the agency to immediately refer that detainee to mental health. Policy MH-15 also

dictates that NYCHHC refer to mental health any detainee with a reported history of psychiatric treatment and any past suicide attempt(s) or ideations.

66.     Defendants did not implement any of the aforementioned measures. Defendants' failure to implement these measures represents a third failure to provide proper treatment and housing to Mr. Muñoz for his serious psychiatric needs and risk of suicide. Defendants failed to initiate these measures despite their actual knowledge of Mr. Muñoz's psychiatric condition and prior suicide attempt. By failing to implement these measures, Defendants placed Mr. Muñoz at greater risk of committing suicide.

67.     Instead of initiating any of the required measures, Defendant Keels did not initiate constant supervision, notify a supervisor, or refer Mr. Muñoz to Medical/Mental Health. Defendants instead sent Mr. Muñoz to general population at MDC, where Mr. Muñoz would be unmonitored and would not be provided with proper treatment for his serious psychiatric needs.

<u>Defendant's next failure to screen and address Mr. Muñoz's serious psychiatric treatment needs and suicidality.</u>

68.     On or about March 13, 2016, Defendant Dr. Roe/Defendant Officer Doe completed a "Mental Health Intake History" for Mr. Muñoz.  Defendant Dr. Roe/Defendant Officer Doe indicated on that document that Mr. Muñoz: carried diagnoses of depression, bipolar disorder, and schizophrenia; was last hospitalized for mental health treatment earlier that month in March of 2016 at Staten Island University; and had trouble falling or staying asleep.

69.     Defendant Dr. Roe/Defendant Officer Doe failed to indicate Mr. Muñoz's previous suicide attempt on or about April 17, 2015. Defendant Dr. Roe/Officer Doe instead erroneously indicated that Mr. Muñoz had last attempted suicide by hanging in December 2014. Defendant Dr. Roe/Defendant Officer Doe made that error despite Defendants' actual knowledge of Mr. Muñoz's April 17, 2015 suicide attempt, which occurred in DOC custody.

70.     Defendant Dr. Roe/Officer Doe failed to take any steps to prevent Mr. Muñoz from committing suicide, including initiating constant supervision, referring him to mental health housing, or referring him for a full mental health evaluation, or providing mental health treatment.

71.     On or about March 13, 2016, pursuant to Defendant City's intake policy, Defendant Rommell Montilus, MD, performed on Mr. Muñoz a routine medical evaluation for a new inmate admission ("medical evaluation"). Defendant Dr. Montilus indicated that Mr. Muñoz was last hospitalized for mental health treatment earlier that month in March 2016, but incorrectly indicated that Mr. Muñoz had last attempted suicide in 2014. Defendant Dr. Montilus made that error despite Defendants' actual knowledge of Mr. Muñoz's April 17, 2015 suicide attempt, which occurred in DOC custody.

72.     Defendant Dr. Montilus referred Mr. Muñoz for a psychiatric assessment, but failed to take any immediate measures to treat Mr. Muñoz's serious psychiatric treatment needs or mitigate his risk of suicide, including initiating constant supervision or referring Mr. Muñoz to mental health housing. In fact, Defendant Dr. Montilus referred Mr. Muñoz to general population despite the fact that he knew Mr. Muñoz would be unmonitored there.

73.     From Mr. Muñoz's placement in general population on March 11, 2016, until Mr. Muñoz's death on March 14, 2016, Defendants failed to conduct a psychiatric assessment of Mr. Muñoz. Defendants failed to do so despite their actual knowledge of Mr. Muñoz's serious psychiatric treatment needs and risk of suicide.

Defendants' Cancellation of Mr. Muñoz's Psychiatric Assessment Due to a Jail Lockdown.

74.     On or around March 14, 2016, Mr. Muñoz was scheduled to receive a psychiatric assessment based on Defendants' knowledge of his serious psychiatric treatment needs. On information and belief, a DOC imposed a lockdown upon all individuals detained at MDC that day. During lockdown, all movement within a facility ceases. Detainees in cells are confined to them indefinitely – sometimes for hours or even days.

75.     On or around March 8, 2016 at a New York City Board of Correction (the "Board") meeting, DOC Chief of Department Martin J. Murphy unequivocally stated that medical appointments are not cancelled during lockdowns.  Captain Murphy indicated that medical and mental health rounds and psychiatric assessments continue during a jail lockdown.

76.     The exact opposite happened here.  Defendants cancelled Mr. Muñoz's March 14, 2016 psychiatric assessment due to a jail lockdown. At approximately 10:12 pm on March 14, 2016, during that DOC event, Defendant Michael Bolus, NP, indicated in Mr. Muñoz's medical records that Mr. Muñoz was not seen for the psychiatric assessment due to a "DOC Event ALARM," and "ASAP. PLEASE RESCHEDULE." Defendants never rescheduled Mr. Muñoz's psychiatric assessment.

<u>Mr. Muñoz's Suicide.</u>

77.     As a result of Defendants' failures, Mr. Muñoz committed suicide by hanging himself on March 14, 2016. He died alone while locked in his cell.

78.      Mr. Muñoz's medical records state:

DOC staff requested medical attention for an unresponsive pt via hanging in Building 8E, on arrival pt [sic] was found sitting on a toilet looking cyanotic, cold to touch, neck laterally flexed to the right with visible ligature mark on the left. Emergency response system was activated, carotid pulse not palpable, pt's stiff body was placed on the ground to start CPR. Cardiac monitor showed asystole when connected, while CPR was in progress Dr. Mateo attempted endotracheal intubation but pt's mouth could not be opened, therefore manual ventilation

19

continued. Epinephrine 1mg injection was given intracardially as instructed by MD in charge, CPR continued until the Paramedics arrived to pronounce patient.

79.     DOC requested medical attention in response to finding Mr. Muñoz unresponsive, at approximately 9:33 pm. Mr. Muñoz was pronounced dead at approximately 9:58 pm. Mr. Muñoz was found sitting on a toilet cyanotic and cold to the touch. Rigor mortis had set in, and his mouth could not be opened for intubation.

80.     The time that elapsed with Mr. Muñoz's condition unnoticed by DOC staff further underscores Defendants' deliberate indifference in failing to monitor individuals with serious psychiatric needs during isolation such as lockdowns, and failure to conduct security or mental health rounds during lockdowns.

## DEFENDANT CITY'S CUSTOM OR PRACTICE OF DELIBERATE INDIFFERENCE IN FAILING TO PROVIDE PROPER TREATMENT AND HOUSING TO INDIVIDUALS ENTERING THE JAILS WITH SERIOUS PSYCHIATRIC TREATMENT NEEDS AND/OR A RISK OF SUICIDE.

81.     At all times here relevant, Defendant City's written policy mandated Mr. Muñoz's prompt placement on constant supervision, transfer to a mental health housing unit, referral to mental health, and assessment of psychiatric treatment needs. Defendants City, NYCHHC and Supervisory Defendants failed to take those measures at the time of Mr. Muñoz's death, despite their knowledge of his serious psychiatric treatment needs and risk of suicide.

82.     Defendants' conduct represents a continuation of Defendants City's and NYCHHC's custom or practice of deliberate indifference in failing to provide proper treatment or housing to individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide. That deliberate indifference manifests in its failure to adequately screen those individuals, appropriately assess their suicide risk, place them in appropriate settings, assess their psychiatric treatment needs, and provide them with psychiatric treatment when isolated due to

lockdowns or other adverse jail conditions. Defendant City's and NYCHHC's custom or practice of deliberate indifference constitutes the direct and proximate cause of Mr. Muñoz's death.

83.     For decades before Mr. Muñoz's death, Defendants City and NYCHHC have been aware of this custom or practice. In fact, since the 1980s at the latest, the Board and Defendant City have recognized that individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide are particularly vulnerable, and that their risk is heightened if they are not provided with needed psychiatric treatment in appropriate housing.

84.     Accordingly, in 1985, the Defendant City adopted Mental Health Minimum Standards for the City jails, establishing standards for, among other things, the provision of psychiatric treatment to individuals with serious psychiatric treatment needs, the proper treatment of individuals who present a suicide risk, and the design of housing areas to minimize distress and self-injurious behavior. NYCHHC plays a paramount role in ensuring that the Mental Health Minimum Standards are properly implemented. Despite the existence of those standards, however, Defendants City and NYCHHC have persisted in their custom or practice, despite their knowledge that proper treatment and housing are essential for protecting the safety of individuals with serious psychiatric treatment needs and/or a risk of suicide. Defendant City and NYCHHC's failures have resulted in the avoidable deaths of many individuals with serious psychiatric treatment needs or a risk of suicide over the span of several years.

85.     For example, on August 18, 2012, Jason Echevarria, a detainee with bipolar disorder, died due to Defendant City's deliberate indifference. Mr. Echevarria, who was held on Rikers Island following multiple suicide attempts in DOC custody, died after swallowing a packet of toxic detergent. Employees of Defendant City, which was responsible for Mr.

Echevarria's well-being, deliberately failed to summon medical or psychiatric assistance while he lay dying in his cell.

86.     On October 13, 2013, Horsone Moore, a detainee with serious psychiatric treatment needs, died due to Defendant City's deliberate indifference. Mr. Moore, who was held on Rikers Island, was referred to suicide watch after attempting suicide on October 11, 2013 in the Bronx Court pens. That suicide watch was never implemented. Instead, Defendant City allowed Mr. Moore to unsuccessfully attempt suicide twice on Rikers Island, while unsupervised. Mr. Moore was successful on October 17, 2013, when he hanged himself from the shower frame in his cell.

87.     On September 11, 2013, Bradley Ballard, a detainee with schizophrenia, died due to Defendant City's deliberate indifference. Mr. Ballard died after being locked inside his cell for seven straight days. Defendant City and medical personnel checked his cell only twice over that seven day span and failed to administer his medication or summon or provide psychiatric assistance.

88.     On February 15, 2014, Jerome Murdough, a detainee with serious psychiatric treatment needs, died due to Defendant City's deliberate indifference.  Mr. Murdough's psychotropic medication made him particularly susceptible to heat, but he was locked in a cell that was over 100 degrees. Mr. Murdough baked to death in that cell due to Defendant City's failure to properly place him, conduct rounds, or summon psychiatric assistance.

89.     On January 1, 2015, Fabian Cruz, a detainee with serious psychiatric treatment needs, died due to Defendant City's deliberate indifference. Mr. Cruz was referred to

suicide watch, but that suicide watch was never implemented. Mr. Cruz was found dead in his cell, lying face up, with a bed sheet tied around his neck.

90.     On January 24, 2016, Angel Perez-Rios, a detainee with serious psychiatric treatment needs, died due to Defendant City's deliberate indifference. Mr. Perez-Rios was scheduled for three psychiatric appointments to evaluate his request for stronger psychotropic medication to treat his condition, but all three of those appointments were cancelled due to lockdowns. Mr. Perez-Rios was found hanging from his cell window by a noose made of shoelaces.

91.     These individuals died in part because of Defendant City's custom and practice of deliberate indifference in failing to provide proper treatment or housing to individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide. Such avoidable deaths over the span of years demonstrate that Defendant City's custom or practice has been longstanding. Notably, Defendant City's custom and practice continued after it realized during the 1980s that it must provide proper treatment to individuals with serious psychiatric treatment needs, and amended its minimum standards in response to that realization.

92.     Defendants City's and NYCHHC's deliberate indifference also manifests in their failure to place into appropriate housing individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide. Defendants City and NYCHHC continue to subject those individuals to isolation during lockdowns even though those individuals must be on constant supervision status in mental observation settings. Despite the frequency of lockdowns, Defendants City and NYCHHC have failed to institute measures to ensure people get to their appointments when such lockdowns occur. Defendant City and NYCHHC also persist in their

failure to provide psychiatric treatment to those who enter the jails with serious psychiatric treatment needs and/or a risk of suicide and are subjected to isolation during lockdowns.

93.     Defendants City and NYCHHC know that individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide are acutely negatively impacted by isolation. Based on the expansive body of evidence that isolation is harmful to individuals with serious psychiatric treatment needs, Defendants created alternative clinical settings for individuals with those needs in the City jails. A 2014 study about self-harming behaviors in the City jails, conducted by Defendant City, states that due to self-harm, "the New York City jail system has modified its practices to direct inmates with mental illness who violate jail rules to more clinical settings and eliminate solitary confinement for those with serious mental illness." *See* Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, Am. J. Pub. Health, Feb. 12, 2014, *available at* http://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2013.301742.

94.     In 2015, after public hearings pursuant to the City Administrative Procedures Act, the Board amended the jail minimum standards concerning the utilization of punitive segregation—disciplinary confinement that was 23 hour-per-day lock-in—to exclude from such confinement individuals with "serious mental disabilities . . . or conditions" because of the known negative effects and dangers of such isolation. The Board adopted Minimum Standard §1-17 (b)(1)(iii). Defendants City and NYCHHC are required to follow the Board's standards and amended their policies concerning the use of punitive segregation—another form of isolation—for individuals with serious psychiatric treatment needs. Defendant City and NYCHHC did not oppose the Board's amendment concerning the exclusion of individuals with serious psychiatric treatment needs from isolation in punitive segregation housing.

95.     Isolation caused by lockdowns creates the same risks of harm as does isolation in punitive segregation, particularly for individuals who enter jail with serious psychiatric treatment needs or a risk of suicide.  The City is deliberately indifferent to the risks it creates in implementing its lockdowns without provision of proper medical supervision of individuals with serious psychiatric needs and/or a risk of suicide, monitoring of such individuals, and provision of medical services during a lockdown.

96.     Not only do Defendants continue to subject those individuals to lockdowns, but they cancel psychiatric appointments when those individuals are placed in lockdowns, and fail to take any affirmative steps to ensure the safety of those scheduled for psychiatric appointments. Defendants City's and NYCHHC's persistent cancellation of psychiatric appointments during lockdowns constitutes a shocking and extremely dangerous manifestation of their custom or practice of deliberate indifference to providing proper treatment to people entering the jails with serious psychiatric treatment needs and/or a risk of suicide.

97.     The Board has published data which demonstrates that a significant number of medical appointments have been cancelled due to lockdowns. Those cancellations deepen the risk of suicide, particularly for those who enter the jails at a heightened risk in the first instance. It is for that reason that the City's stated policy is that such appointments are not cancelled during a lockdown. Its practice, however, is starkly different.

98.     The Legal Aid Society Prisoners' Rights Project has received numerous and ongoing complaints from incarcerated people that they are not taken to medical or mental health treatment during lockdowns, and that appointments are cancelled.

99.     The practice of failing to monitor individuals held in isolation during lockdowns, failing to provide medical or mental health rounds, and cancellation of medical

appointments during lockdowns are further manifestations of Defendants' deliberate indifference to the serious medical needs of people with serious mental illness and/or risk of suicide.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (Against Individual Officer Defendants and Medical Defendants)

100.    All preceding paragraphs are incorporated here by reference.

101.    The Individual Officer Defendants and Medical Defendants exhibited deliberate indifference to Mr. Muñoz 's known, serious psychiatric treatment needs when they failed to provide Mr. Muñoz with proper treatment or housing, thereby depriving Mr. Munoz of his rights, privileges, and immunities in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

102.    Individual Officer Defendants and Medical Defendants had actual knowledge of Mr. Muñoz's serious psychiatric treatment needs and serious risk of suicide.  They were clearly documented in his medical and correctional records. In particular, Individual Officer Defendants and Medical Defendants were aware that Mr. Munoz made a serious suicide attempt in DOC custody on April 17, 2015, less than a year before his incarceration on March 11, 2016.

103.    It was also documented in Mr. Muñoz's medical and correctional records that Mr. Muñoz continued to express suicidal ideations subsequent to his April 17, 2015 attempt, was transferred to Lincoln Hospital and Bellevue, and was subsequently placed into mental observation housing. Individual Officer and Medical Defendants were aware of Defendant City's written policies, which state that individuals who have attempted suicide less than one year prior to their incarceration must be placed in mental observation housing on constant supervision and receive a prompt psychiatric assessment. In addition, Mr. Muñoz's commitment card from his

most recent arraignment court was clearly marked for medical attention. Despite this knowledge,

Individual Officer Defendants and Medical Defendants neither screened him for risk

appropriately, nor prioritized Mr. Muñoz 's psychiatric assessment, nor placed him on constant

supervision in mental observation housing.

104.     Mr. Muñoz was scheduled to receive a psychiatric assessment based on

Defendants' knowledge of his serious psychiatric needs, but Defendants cancelled that

appointment due to a jail lockdown, further deepening Mr. Muñoz's risk of suicide.

105.     Individual Officer Defendants and Medical Defendants acted under color

of state law. Individual Officer Defendants and Medical Defendants acted willfully and

knowingly to deprive Mr. Muñoz of his constitutional rights secured by 42 U.S.C. § 1983 and by

the Fourth and Fourteenth Amendments to the United States Constitution.

106.     As a direct and proximate result of the Individual Officer Defendants' and

Medical Defendants' deliberate indifference to Mr. Muñoz's known serious psychiatric treatment

needs and known risk of suicide, Mr. Muñoz sustained damages alleged herein.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**(Against Supervisory Defendants)**

107.     All preceding paragraphs are incorporated here by reference.

108.     At all times relevant to this Complaint, Individual Officer Defendants, as

correctional officers of DOC, were acting under the direction and control of Defendant Joseph

Ponte.

109.     At all times relevant to this Complaint, Medical Defendants, as employees

of NYCHHC, were acting under the direction and control of Defendant Dr. Ram Raju.

110.     Supervisory Defendants knew of a custom or practice of deliberate indifference in failing to provide proper treatment or housing to individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide. Supervisory Defendants knew that this custom or practice of deliberate indifference manifested in a failure to adequately screen those individuals, appropriately assess their suicide risk, place them in appropriate housing, assess their psychiatric treatment needs, and provide them with psychiatric treatment when isolated due to lockdowns or other adverse jail conditions.

111.     Supervisory Defendants permitted and allowed the continuance of this custom, putting individuals entering the jails with serious psychiatric treatment needs and or/a risk of suicide in danger of serious harm or death. Supervisory Defendants' failure to take measures to curb this custom or practice constituted acquiescence in the known unlawful behavior of their subordinates, and constituted deliberate indifference to the rights and safety of Mr. Muñoz.

112.     Supervisory Defendants' conduct was a substantial factor in the continuation of such a custom, and was a direct and proximate cause of the constitutional violations alleged in this Complaint and of Plaintiff's resultant damages.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (Against NYCHHC and Defendant City)

113.     All preceding paragraphs are incorporated here by reference.

114.     NYCHHC, acting under color of state law as a provider of medical and mental health services in Defendant City's jails, maintained a custom or practice of deliberate indifference to serious medical needs in failing to provide proper treatment or housing to individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide.

NYCHHC's policy manifested in its failures to adequately screen individuals, appropriately assess their suicide risk, place them in appropriate settings, assess their psychiatric treatment needs, and provide them with mental health treatment when isolated due to lockdowns or other adverse jail conditions. NYCHHC maintained that custom and practice despite known risk of harm.

115.    By permitting, tolerating, and sanctioning such corporate custom and practice, NYCHHC caused Mr. Muñoz's suicide and deprived him of rights, remedies, privileges, and immunities in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

116.    As a direct and proximate result of NYCHHC's maintenance of such custom and practice, Plaintiff sustained the damages alleged herein.

117.    Defendant City, acting under color of state law, maintained a custom or practice of deliberate indifference to serious medical needs in failing to provide proper treatment or housing to individuals entering the jails with serious psychiatric treatment needs and/or a risk of suicide. Defendant City's policy manifested in its failures to adequately screen individuals, appropriately assess their suicide risk, place them in appropriate settings, assess their psychiatric treatment needs, and provide them with mental health treatment when isolated due to lockdowns or other adverse jail conditions. Defendant City maintained that custom or practice despite known risk of harm.

118.    By permitting, tolerating, and sanctioning such municipal custom or practice, Defendant City caused Mr. Muñoz's suicide and deprived him of rights, remedies, privileges, and immunities in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

119.     As a direct and proximate result of Defendant City's maintenance of such custom and practice, Plaintiff sustained the damages alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Medical Malpractice**
**(Against Medical Defendants, NYCHHC, and Defendant City)**

120.     All preceding paragraphs are incorporated here by reference.

121.     At all times relevant to this Complaint, the Medical Defendants, NYCHHC, and Defendant City agreed to and undertook to provide medical and psychiatric treatment to individuals in their custody at MDC, including Mr. Muñoz. Medical Defendants, NYCHHC, and Defendant City were legally obligated and had a special duty to do so effectively.

122.     Medical Defendants and NYCHHC were employed, retained, and/or contracted with Defendant City to provide medical and psychiatric treatment to all individuals in the care and custody of Defendant City at MDC, including Mr. Muñoz.

123.     Medical Defendants, NYCHHC, and Defendant City owed Mr. Muñoz a duty to provide medical and psychiatric treatment in accordance with the accepted standards of care in the community, and to use their best judgment in the evaluation and care of Mr. Muñoz.

124.     Medical Defendants, NYCHHC, and Defendant City held themselves out as possessing the proper degree of learning and skill necessary to render medical and psychiatric treatment, and services in accordance with good and accepted medical practice. They undertook to use reasonable care and diligence in the care and treatment of individuals detained at MDC, including Mr. Muñoz.

125.     Medical Defendants, NYCHHC, and Defendant City were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice

against Mr. Muñoz by failing to provide proper treatment despite his known serious psychiatric treatment needs and known risk of suicide.

126.     Defendant City, as employer of Medical Defendants and as the agent of NYCHHC, is responsible for Medical Defendants' and NYCHHC's malpractice, negligence, and wrongdoing under the doctrine of *respondeat superior*.

127.     Defendant City is responsible for Medical Defendants' and NYCHHC's negligence and wrongdoing because it retained them to perform services that Defendant City had undertaken to perform, and was under a special duty and legal obligation to perform.

128.     Medical Defendants', NYCHHC's, and Defendant City's medical malpractice, negligence, and unskillfulness was the direct and proximate cause of Mr. Muñoz's injury and death, and Plaintiff's resultant damages.

129.     A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed to this Complaint.

**FIFTH CLAIM FOR RELIEF**
**New York State Constitution, Article I, §§ 12, 16**
**(Against All Defendants)**

130.     All preceding paragraphs are incorporated here by reference.

131.     By denying Mr. Muñoz adequate medical and mental health treatment, resulting in his death, Defendants deprived him of his rights, privileges, and immunities guaranteed to every New Yorker by Article I, §§ 12 and 16 of the New York Constitution.

132.     Defendants acted under color of state law, in their individual and official capacities, and within the scope of their respective employments. Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

Defendants acted knowingly and with intent to deprive Mr. Muñoz of his constitutional rights secured by Article I, §§ 12 and 16.

133.    Defendants and their officers, agents, servants, and employees were responsible for the deprivation of Mr. Muñoz's state constitutional rights.

134.    Defendant City is responsible for the negligence of NYCHHC, the Medical Defendants, and the Individual Defendants because it retained them to perform services that Defendant City had undertaken to perform and was under a special duty and legal obligation to perform.

135.    As the direct and proximate result of the illegal action detained above, Plaintiff sustained the damages alleged herein.

136.    A damages remedy here is necessary to effectuate the purposes of §§ 12 and 16 of the New York State Constitution, and appropriate to ensure full realization of Plaintiff's rights under those sections.

**SIXTH CLAIM FOR RELIEF**
**Negligence**
**(Against All Defendants)**

137.    All preceding paragraphs are incorporated here by reference.

138.    Defendants maintained a special relationship with and owed a duty of care to Mr. Muñoz as a detainee in Defendant City's custody and care.

139.    Defendants repeatedly breached the duty of care they owed to Mr. Muñoz by failing to take reasonable steps to prevent him from committing suicide, including: promptly and accurately assessing his psychiatric conditions; accurately reviewing and recording his psychiatric condition; referring him for psychiatric treatment in accordance with applicable

policy; ensuring he received psychiatric treatment; adequately staffing mental health positions; and appropriately training staff.

140.   Defendants' breach of their duty of care was the direct and proximate cause of Mr. Muñoz's death.

141.   Defendant City is responsible for the negligence of NYCHHC, the Medical Defendants, and the Individual Officer Defendants because it retained them to perform services that the City had undertaken to perform and was under a special duty and legal obligation to perform.

142.   As a direct and proximate result of the unlawful conduct detailed above, Plaintiff sustained the damages alleged herein.

**SEVENTH CLAIM FOR RELIEF**
**Negligent Supervision and Training**
**(Against all Supervisory Defendants)**

143.   The above paragraphs are incorporated here by reference.

144.   Medical Defendants and Individual Officer Defendants owed a duty of care to Mr. Muñoz to prevent his suicide. Under the same or similar circumstances, a reasonably prudent and careful person should have anticipated that Mr. Muñoz's suicide would result from the foregoing conduct.

145.   Upon information and belief, Medical Defendants and Individual Officer Defendants were unfit and incompetent for their positions.

146.   Supervisory Defendants knew or should have known through exercise of reasonable diligence that Medical Defendants and Individual Officer Defendants they employed were unfit and incompetent for their positions. Supervisory Defendants' negligence in screening, hiring, training, disciplining, and ultimately retaining Medical Defendants and Individual Officer

33

Defendants was the direct and proximate cause of Mr. Muñoz's suicide, and Plaintiff's resultant damages.

147.    As a direct and proximate result of the unlawful conduct detailed above, Plaintiff sustained the damages alleged herein.

**EIGHTH CLAIM FOR RELIEF**
**Wrongful Death**
**(Against All Defendants)**

148.    All preceding paragraphs are here incorporated by reference.

149.    By reason of the foregoing, the statutory distributees of Mr. Muñoz's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Muñoz. Defendants are liable for the wrongful death of Mr. Muñoz.

150.    As a consequence, Plaintiff has suffered loss and damages in an amount to be determined at trial.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

A.    awarding compensatory damages in an amount to be determined at trial;

B.    awarding punitive damages against the Individual Defendants in an amount to be determined at trial;

C.    awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action under 42 U.S.C. § 1988; and

D.    granting such other and further relief as this Court deems just and proper.

Dated: January 16, 2018
       New York, New York

THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT

_____
Stefen R. Short (sshort@legal-aid.org)
Mary Lynne Werlwas (mlwerlwas@legal-aid.org)
Veronica Vela (vvela@legal-aid.org)
Sarah Kerr (skerr@legal-aid.org)
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530


O'MELVENY & MYERS LLP

_/s/ Mark A. Racanelli_____
Mark A. Racanelli
Brad M. Elias
Garabed M. Hoplamazian
Marjorie B. Truwit
7 Times Square
New York, New York 10036
Telephone:   (212) 326-2000
Facsimile:   (212) 326-2061
E-mail:      mracanelli@omm.com
             belias@omm.com
             ghoplamazian@omm.com
             mtruwit@omm.com

*Counsel for Plaintiff Emeteria Muñoz*